Christopher JORDAN, by his parents and next friends, Philip and Betty Sue JORDAN, individually and on behalf of all others similarly situated; Betty Sue Jordan, individually and on behalf of all others similarly situated; Philip Jordan, individually and on behalf of all others similarly situated; Sarah Jordan, by her parents and next friends, Philip and Betty Sue Jordan, individually and on behalf of all others similarly situated; Amber Jordan, by her parents and next friends, Philip and Betty Sue Jordan, individually and on behalf of all others similarly situated, Plaintiff–Appellants,

v.

Larry D. JACKSON, in his official capacity as Commissioner of the Virginia Department of Social Services; Rita L. Katzman, in her official capacity as Manager of the Child Protective Services Program of the Virginia Department of Social Services; Prince William County; Prince William County Department of Social Services, Defendants–Appellees.

No. 93–1656.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 26, 1993.

Decided Jan. 31, 1994.

**ARGUED:** Stephen Winston Bricker, Stephen W. Bricker & Associates, P.C., Richmond, VA, for Appellants. Donald G. Powers, Office of the Attorney General of Virginia, Verona, VA; Sharon E. Pandak, County Atty., County Attorney's Office, Prince William, VA, for Appellees.

**ON BRIEF:** Victor M. Glasberg, Jeanne Goldberg, Victor Glasberg & Associates, Alexandria, VA; Stephen B. Pershing, Legal Director, American Civil Liberties Union Foundation of Virginia, Richmond, VA, for Appellants. Jane D. Hickey, Craig M. Burshem, Office of the Attorney General of Virginia, Richmond, VA, for Appellees.

Before WILKINSON and LUTTIG, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

**OPINION**

LUTTIG, Circuit Judge:

We address in this appeal the awesome and, regrettably, sometimes necessary, power of the state to take custody of children from their parents in order to protect the children from irreparable injury or death. We confront herein allegations against the state in connection with its exercise of that power that, if true, are disturbing, and that we hope are exceptional. As always, however, our only responsibility is to interpret the law. Confining ourselves to that charge, we conclude that the state statute challenged by appellants, pursuant to which judicial review of the child's removal from his home was delayed, is constitutional both facially and as applied in the circumstances of this case. For reasons set forth below, though, we believe that appellants have adequately pleaded a separate claim against the appellees under 42 U.S.C. § 1983 for violation of their constitutional rights as a consequence of the initial removal of their child from his home by state authorities. We therefore remand the case for such further proceedings on that claim as may be necessary.

I.

The facts alleged in the Jordans' amended complaint, which we accept as true, *see, e.g., Berkovitz v. United States,* 486 U.S. 531, 540, 108 S.Ct. 1954, 1960–61, 100 L.Ed.2d 531 (1988), are as follows. Philip and Betty Sue Jordan both worked fulltime. Their young daughters, ages three and six, were with babysitters or in day care when not in school. Their ten year-old son, Christopher, however, took care of himself after school on weekdays, usually for about an hour and a half, until his parents returned home from work. Christopher had enrolled in and completed a program offered at his school called "Strong Families: Competent Kids" designed to train children to care for themselves for short periods. Christopher also had been instructed by his parents in how to care for himself. His parents required him, upon arriving home from school, to call one of them. He frequently called both of them.

On Thursday, January 31, 1991, someone informed the Prince William County Department of Social Services (DSS) that Christopher was home alone, both before and after school, and was fighting with other children at the bus stop. The DSS assigned the case to Judy Jordan (no relation to appellants). The next afternoon, on Friday, February 1, without having contacted Christopher's parents or otherwise sought information about Christopher from them, Jordan approached Christopher as he walked home from the school bus stop and attempted to question him. Christopher, frightened at being approached and addressed by a stranger, ran from Jordan and tried to hide. Jordan then seized Christopher under the authority of Virginia Code § 63.1–248.9,[1] which provides

1. Va.Code § 63.1–248.9 (Michie Supp.1993) provides:

A. A physician or protective service worker of a local department or law-enforcement official investigating a report or complaint of abuse and neglect may take a child into custody for up to seventy-two hours without prior approval of parents or guardians provided:

1. The circumstances of the child are such that continuing in his place of residence or in the care or custody of the parent, guardian, custodian or other person responsible for the child's care, presents an imminent danger to the child's life or health to the extent that severe or irremediable injury would be likely to result; and

2. A court order is not immediately obtainable; and

3. The court has set up procedures for placing such children; and

4. Following taking the child into custody, the parents or guardians are notified as soon as practicable that he is in custody; and

5. A report is made to the local department; and

6. The court is notified and the person or agency taking custody of such child obtains, as soon as possible, but in no event later than seventy-two hours, an emergency removal order pursuant to § 16.1–251; however, if a preliminary removal order is issued after a hearing held in accordance with § 16.1–252 within seventy-two hours of the removal of the child, an emergency removal order shall not be necessary.

B. If the seventy-two hour period for holding a child in custody and for obtaining a preliminary or emergency removal order expires on a Saturday, Sunday, or other legal holiday, the seventy-two hours shall be extended to the next day that is not a Saturday, Sunday, or other legal holiday, but in no event shall either such period exceed ninety-six hours.

for the assumption of custody of children in imminent danger, and took him to foster care. Jordan left a hand-written note on appellants' door advising them that Christopher would be in foster care for at least three days. Christopher's father was expected home from work approximately thirty minutes later.

Upon arriving home and finding their son missing, the Jordans called the local police, fearing Christopher had been kidnapped. The police confirmed that Christopher had been taken into foster care and informed the Jordans that under no circumstances would they be allowed to contact their son until Monday. On Monday, the DSS returned Christopher to his parents.

The Jordans—Christopher, his parents, and his two sisters—then brought this action under 42 U.S.C. § 1983 against Prince William County, the County DSS, the Commissioner of the Virginia DSS, and the Manager of the Virginia Child Protective Services Program. For reasons that do not appear in the record, they did not name as a defendant Judy Jordan, the DSS worker who had removed Christopher. The Jordans advanced three claims. The first was that the initial removal of Christopher by the DSS violated their federal constitutional rights as well as Virginia law, since Christopher had never been in imminent danger of irremediable harm. The second and third were due process and equal protection challenges to the constitutionality of the statutory provisions allowing a delay of several days before obtaining judicial review of the emergency removal of a child by the state. The district court dismissed all of the Jordans' claims under Fed.R.Civ.P. 12(b)(6), and this appeal followed.

## II.

The Jordans first claim that the initial removal of Christopher by the DSS violated the Fourteenth Amendment, as well as Virginia Code § 63.1–248.9. Their complaint alleges that since Christopher had never been in imminent danger—indeed any danger at all—his summary removal violated the guarantees of due process by unjustifiably interfering with the integrity and privacy of their family. They further allege that the named defendants caused this deprivation of their rights by maintaining various municipal policies or customs that proximately caused Christopher's allegedly unlawful removal.

The district court dismissed this cause of action for failure to state a claim, on the ground that under *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the defendants could not be liable on a theory of *respondeat superior.* The court stated that the only person who could be liable under section 1983 if the seizure had been unconstitutional was the individual DSS worker, whom plaintiffs did not name as a defendant. J.A. at 78.

Appellees defend the district court's dismissal on the grounds that the Jordans' complaint did not adequately allege that the County and Commonwealth caused the constitutional deprivation allegedly inflicted by the County employee. They argue in particular that the averments of the Jordans' complaint were insufficient to state a claim for municipal liability because they failed to allege multiple incidents of misconduct in support of their contentions that municipal policy proximately caused their son's allegedly unconstitutional removal. This presents us with a question of first impression in this circuit, and it is a question apparently not addressed in any other circuit either since the Supreme Court's recent decision in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* — U.S. —, —, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993).

As to this question, we disagree that appellants were required to allege more than one incident of misconduct in order to withstand a motion to dismiss under Rule 12(b)(6). In *Monell,* the Supreme Court construed section 1983 so as to allow municipalities to be held liable for constitutional violations committed by their employees where the municipality is itself responsible for causing the constitutional deprivation. 436 U.S. at 694, 98 S.Ct. at 2037. Although, as the district court recognized, the Court rejected contentions that municipal liability can be predicat-

ed on the principles of *respondeat superior* or vicarious liability, it held that liability could attach when the "execution of the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.; see also Spell v. McDaniel,* 824 F.2d 1380, 1385 (4th Cir.1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *Hughes v. Halifax County School Bd.,* 855 F.2d 183, 185 (4th Cir.1988), *cert. denied,* 488 U.S. 1042, 109 S.Ct. 867, 102 L.Ed.2d 991 (1989).

Section 1983 plaintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights.[2] *See, e.g., Spell,* 824 F.2d at 1387–88. The substantive requirements for proof of municipal liability are stringent. *See* discussion *infra.* The Supreme Court, however, has only recently confirmed that section 1983 claims are not subject to a "heightened pleading standard" paralleling the rigors of proof demanded on the merits. *Leatherman,* — U.S. at —, 113 S.Ct. at 1163. In rejecting the Fifth Circuit's heightened standard, Chief Justice Rehnquist concluded for the Court that "it is impossible to square the 'heightened pleading standard' ... with the liberal system of 'notice pleading' set up by the Federal Rules." *Id.*

There is some question as to the precise "heightened standard" rejected by the Court in *Leatherman.* The Court quotes the following passage from *Elliott v. Perez,* 751 F.2d 1472, 1473 (5th Cir.1985), which would appear to have little to do with municipal liability,[3] as "describ[ing]" that standard:

> In cases against government officials involving the likely defense of immunity we require of trial judges that they demand that the plaintiff's complaints state with factual detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity.

— U.S. at —, 113 S.Ct. at 1163. It cites to that portion of the Fifth Circuit's *Leatherman* decision in which the Court of Appeals describes its heightened standard by quoting the very same passage from *Elliott. Id.* — U.S. at —, 113 S.Ct. at 1162–63 (citing 954 F.2d at 1057–58). And it unquestionably rejects this standard, which the Fifth Circuit described in *Rodriguez v. Avita,* 871 F.2d 552, 554 (5th Cir.), *cert. denied,* 493 U.S. 854, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989), as "la[ying] down as the law of [the] Circuit that in 'cases invoking 42 U.S.C. § 1983 we consistently require the claimant to state specific facts, not merely conclusory allegations.'" *Id.* (quoting *Elliott,* 751 F.2d at 1479; footnote omitted). The Supreme Court, however, never expressly rejects the respondents' argument that "a plaintiff must do more than plead a single instance of misconduct," — U.S. at —, 113 S.Ct. at 1162.

The uncertainty in the Supreme Court's opinion appears attributable largely to the fact that although the respondents apparently argued (at least in the Supreme Court) that multiple incidents of unconstitutional conduct must be pleaded, the Fifth Circuit did not adopt or apply in *Leatherman* the specific requirement that a plaintiff plead more than one such incident in order to assert a claim against a municipal defendant. Indeed, it does not seem that that particular requirement was even at issue; the *Leather-*

2. The Jordans argue that since their complaint sought only prospective injunctive relief, an allegation of official policy or custom is unnecessary. *See Chaloux v. Killeen,* 886 F.2d 247, 251 (9th Cir.1989); *Nobby Lobby, Inc. v. City of Dallas,* 767 F.Supp. 801, 810 (N.D.Tex.1991). Their exclusive reliance on these cases is misplaced since, in addition to injunctive relief, their complaint also seeks nominal damages from the County defendants.

3. The Fifth Circuit itself in *Leatherman* appears to have understood the "heightened pleading standard" as concerned solely with claims against individual municipal officials, not municipalities and, for this reason, questioned the extension of the heightened standard to the municipal liability context, given that the qualified immunity defense is unavailable to municipalities under *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). *See* 954 F.2d 1054, 1057 (5th Cir.1992), *rev'd,* — U.S. —, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *see also infra* note 5.

*man* plaintiffs pleaded two incidents of alleged unconstitutional conduct. *See* 954 F.2d at 1055–56. Rather, the pleading inadequacy identified by the Court of Appeals was that the plaintiffs alleged the failure to formulate and implement an appropriate training policy in only "boilerplate" fashion, without stating sufficient underlying facts, including the content of the policy allegedly giving rise to the injury. *Id.* at 1056 & n. 2. It was these shortcomings that prompted the Court of Appeals to hold, without any mention whatsoever of a requirement that plaintiffs plead multiple incidents of unconstitutional conduct,[4] that "[w]hile plaintiffs' complaint sets forth the facts concerning the police misconduct in great detail, it fails to state any facts with respect to the adequacy (or inadequacy) of the police training." *Id.* at 1058.

We believe it is clear, however, that the Supreme Court's rejection of the Fifth Circuit's "heightened pleading standard" in *Leatherman* constitutes a rejection of the specific requirement that a plaintiff plead multiple instances of similar constitutional violations to support an allegation of municipal policy or custom. Although the Court never referenced a requirement of pleading multiple incidents in its description of the Fifth Circuit's standard or in its analysis, it is apparent that the several-paragraph discussion following its statement of respondents' specific contention that multiple incidents must be pleaded was intended as a direct response to that contention. *See* *Leatherman,* — U.S. at ———, 113 S.Ct. at 1162–63. Moreover, the Court specifically cited *Palmer v. City of San Antonio,* 810 F.2d 514 (5th Cir.1987), for its observation that the Fifth Circuit had extended its heightened pleading standard to complaints against municipalities under section 1983. *Leatherman,* — U.S. at —, 113 S.Ct. at 1163. The Fifth Circuit did expressly hold in *Palmer,* as a corollary to its heightened pleading standard, that the pleading of multiple incidents is required to support an allegation of municipal policy or custom. *See* 810 F.2d at 516–17 ("the assertion of a single incident is not sufficient to show that a policy or custom exists on the part of a municipality") (citing *Bennett v. City of Slidell,* 728 F.2d 762, 768 n. 3 (5th Cir.1984) (*en banc*), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)).

█ We thus conclude that, after *Leatherman,* a section 1983 plaintiff seeking to impose municipal liability must satisfy only the usual requirements of notice pleading specified by the Federal Rules.[5] He is required under Rule 8(a)(2) to provide nothing more than "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman,* — U.S. at —, 113 S.Ct. at 1163 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957) (footnote omitted)). There is no requirement that he detail the facts underlying his claims, or that he plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation. *See Kohl v. Casson,* 5 F.3d 1141, 1148 (8th Cir.1993) (dismissal for failure to allege pattern of similar

4. The Fifth Circuit cited *Palmer v. City of San Antonio,* 810 F.2d 514 (5th Cir.1987), *see* discussion *infra,* but only for the broader proposition that the circuit's heightened pleading standard had been extended "into the municipal liability context." 954 F.2d at 1057.

The Fifth Circuit also recited the caution from its earlier decision in *Rodriguez v. Avita* that in order to *prove* municipal liability based upon inadequate training "there would have to be demonstrated 'at least a pattern of similar incidents in which the citizens were injured' ... [in order] to establish the official policy requisite to municipal liability under section 1983." *Id.* at 1058 (quoting *Rodriguez,* 871 F.2d at 554–55). It did not do so in reference to the stricter pleading requirement, however, as is evident from the fact that it also cited in the same sentence *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy....").

5. In so holding, we express no view on the question as to which the Supreme Court in *Leatherman* expressed no view but seemed almost to suggest might be answered in the affirmative, of "whether [its] qualified immunity jurisprudence would require a heightened pleading standard in cases involving individual government officials." *Leatherman,* — U.S. at —, 113 S.Ct. at 1162.

incidents "may not be sustainable" in light of *Leatherman*); *Ashe v. Corley,* 992 F.2d 540, 545 (5th Cir.1993) (factual detail and particularity not required to state claim for municipal liability); *see also Leatherman,* — U.S. at ———, 113 S.Ct. at 1161–62 (contrasting rejected Fifth Circuit standard with Ninth Circuit standard requiring "nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice," *Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 624 (9th Cir.1988)).

As the Supreme Court stated in *Leatherman,* under the Federal Rules of Civil Procedure, primary reliance must be placed on discovery controls and summary judgment to ferret out before trial unmeritorious suits against municipalities. — U.S. at —, 113 S.Ct. at 1163. No more so after *Leatherman* than before, should the district courts tolerate what will be for plaintiffs the temptation to seek unlimited discovery from municipal defendants in the mere hope of obtaining tidbits of information from which they can cobble together support for what were conclusory allegations of an impermissible municipal policy. The district courts continue to have the wide discretion that they have traditionally enjoyed to deny indiscriminate, blanket requests for all files in a county's possession, which represent little more than fishing expeditions. Nor, after *Leatherman,* are the district courts for any reason hamstrung in their responsibility to award summary judgment against plaintiffs who sue municipalities where no recovery under law is possible. *Leatherman* is a case concerned solely with the pleading requirements of the Federal Rules of Civil Procedure as they relate to actions against municipalities. While its sweep in that area of the law is broad, the case is manifestly not intended to denigrate, much less displace, the procedural tools that have been deliberately strengthened in recent years not only by the drafters of the Federal Rules but by the Supreme Court itself for checking the explosion of meritless lawsuits in the federal court system.

Judged against the aforementioned pleading principles, the Jordans' amended complaint states a claim against the County defendants under section 1983. The complaint alleges the existence of several municipal policies or customs. *See* J.A. at 44–45, ¶¶ 48–50. Specifically, it states that the County defendants maintained a policy of providing inadequate training to their employees both on how to determine whether a summary removal was proper and on the statutory procedural requirements following removal. It states that the defendants encouraged the removal of any child left alone, regardless of the circumstances, and trained their employees accordingly. *See City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989); *Spell,* 824 F.2d at 1389–90. Finally, it alleges that the County defendants condoned and ratified the improper and overreaching conduct of their social workers, including Judy Jordan. *See Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36; *Spell,* 824 F.2d at 1390–91. These policies are alleged, as required, to have proximately caused the assertedly unconstitutional removal of Christopher from the custody of his parents.

These allegations are sufficient to provide the County defendants notice of the nature of the claim against them and the grounds on which it rests, and it does not appear beyond doubt that there is no set of facts which the Jordans could prove in support of this claim which would entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The district court's dismissal of the Jordans' claim against the County and the County DSS stemming from Christopher's initial removal therefore was in error.[6] If, as the district court believed, the Jordans' claim against the County defendants arising from Christopher's initial removal is genuinely without merit, then it will no doubt fail either at the summary judgment stage or at trial, where the required showings are appreciably more demanding.

6. On appeal, the Jordans abandoned their claim against the Commonwealth officials relating to the initial removal. Appellants' Reply Br. at 1 n. 1.

Assuming that a plaintiff has the requisite Article III standing,[7] a failure to train can constitute a "policy or custom" actionable under section 1983 only where the "municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *City of Canton,* 489 U.S. at 388, 109 S.Ct. at 1205; *see also id.* at 390–92, 109 S.Ct. at 1205–07; *Mitchell v. Aluisi,* 872 F.2d 577, 581 (4th Cir.1989); *Spell,* 824 F.2d at 1390. And only if, "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," can a municipality reasonably "be said to have been deliberately indifferent to that need." *City of Canton,* 489 U.S. at 390, 109 S.Ct. at 1205. Mere negligence is insufficient to impose section 1983 liability on a municipality for alleged failure to train. The specifically identified deficiency in training also must be shown to have in fact caused the ultimate violation. *Id.* at 391, 109 S.Ct. at 1206; *Spell,* 824 F.2d at 1390. Moreover, neither a policy or custom of deficient training nor the required causal connection can be shown by proof of a single incident of unconstitutional activity alone. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985) (plurality opinion); *id.* at 831, 105 S.Ct. at 2440 (concurring opinion); *Spell,* 824 F.2d at 1387–88.

These are the questions to which the parties and the district court must address themselves on remand. From the pleadings and the submissions, it is not immediately apparent to us how, in the face of these stringent requirements, the Jordans will ultimately prevail against the County defendants on their claim that official county policies caused any injury that they suffered as a consequence of Christopher's removal; to prevail of course they must prove what at this point they have only alleged, namely, that the County had an official policy or custom of encouraging its social workers to remove children from their parents without justification. *See, e.g.,* Appellants' Br. at 8 (the Jordans properly pleaded their first cause of action because they "directly allege the absence of any circumstances that would legally justify Christopher's summary seizure" and county defendants were properly joined because plaintiffs "specifically allege that the county municipal entities caused and/or contributed to Christopher's unlawful summary seizure by the adoption of county policies encouraging such action"). However, under *Leatherman,* they are entitled to proceed at least to the summary judgment stage on this claim, which challenges the initial removal of Christopher from the custody of his parents, as opposed to the ensuing delay in judicial review, *see infra.*

## III.

Virginia Code § 63.1–248.9(A)(6) provides that after the emergency removal of a child from the custody of his parents or guardians, the person or agency taking custody must obtain a removal order, issued either *ex parte* or after a hearing, from the Juvenile and Domestic Relations District Court "as soon as possible, but in no event later than seventy-two hours" after the removal.[8] The

7. The named plaintiffs of a section 1983 class action "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent," *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975); *see also Blum v. Yaretsky,* 457 U.S. 991, 1001 & n. 13, 102 S.Ct. 2777, 2784 & n. 13, 73 L.Ed.2d 534; that is, they must have the "requisite case or controversy between themselves personally and [the defendants]," *id.* at 1001 n. 13, 102 S.Ct. at 2784 n. 13 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)); otherwise, the putative class action cannot proceed.

8. An amendment effective on July 1, 1992, after Christopher had been returned to his family, further provides that if the seventy-two hour period expires on a weekend or legal holiday, the period may be extended twenty-four hours, to ninety-six hours. *See* Va.Code § 63.1–248.9(B). Although the DSS investigated presumably unfounded allegations of child neglect made against the Jordans in December 1992, after the effective date of this amendment, it is doubtful that the Jordans have the requisite standing to challenge the amendment. Any claim now that they would not only have one of their children removed by the state, but that the removal would occur at such a time as to implicate the amendment, would seem too speculative to satisfy the case or controversy requirements of Article III. *See Heck-*

Jordans are at pains to emphasize that they do not challenge the constitutionality of section 63.1–248.9(A)(1), the statutory provision that authorizes the emergency removal of children whose lives or health are in imminent danger. *See* Appellants' Br. at 9, 13 n. 2. They do, however, challenge on two grounds the constitutionality of the delay in judicial review statutorily permitted by section 63.1–248.9(A)(6).

A.

The Jordans first contend that Virginia Code § 63.1–248.9(A)(6), both facially and as applied, violates the procedural guarantees of the Fourteenth Amendment by permitting a delay of several days before obtaining judicial review of the decision to take emergency custody of a child. They argue that procedural due process requires at least immediate *ex parte* judicial review of an emergency removal in order to minimize the risk of prolonged erroneous interference with protected liberties. The district court rejected the Jordans' facial challenge on the reasoning of *Newton v. Burgin,* 363 F.Supp. 782 (1973), *aff'd,* 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1973), which sustained against a similar constitutional attack a North Carolina statute that permitted a hearing to be delayed up to five days following a removal effected pursuant to an *ex parte* judicial order, *see infra* note 13. *See* J.A. at 76–77. The district court rejected the Jordans' as-applied challenge solely on the grounds that the Jordans had not named as a defendant the DSS official who effected the removal. *Id.* at 78.[9] The state's removal of a child from his parents indisputably constitutes an interference with a liberty interest of the parents and thus triggers the procedural protections of the Fourteenth Amendment. There are few rights more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511 (1978); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *see also Zablocki v. Redhail,* 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978). To say that "the institution of the family is deeply rooted in this Nation's history and tradition," *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (plurality), as the Supreme Court often has said, *see e.g., Michael H. v. Gerald D.,* 491 U.S. 110, 123–24, 109 S.Ct. 2333, 2341–42, 105 L.Ed.2d 91 (1989)

*ler v. Mathews,* 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984); *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–05, 103 S.Ct. 1660, 1664–67, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Shipman v. Missouri Dep't of Family Services,* 877 F.2d 678, 681 (8th Cir. 1989), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 842, 107 L.Ed.2d 837 (1990).

Even assuming that the Jordans have standing to challenge this portion of the statute, however, this amendment, as a logical matter, cannot save their facial challenge to the statute, because it cannot negate the existence of permissible applications of the statute, *see* discussion *infra* at 343–344, and is wholly irrelevant to the Jordans' as-applied challenge to Virginia Code § 63.1–248.9, because they contest only a delay of approximately 65 hours between Christopher's initial removal and his return, *see* discussion *infra* at 345 and note 14.

9. Appellants are rather obviously confused over the differences between facial and as-applied challenges outside of the First Amendment context, as is evident from a juxtaposition of their complaint with their briefs and oral argument. *See generally infra* part III.A.1. For example, although their amended complaint expressly raises an as-applied challenge to section 63.1–248.9, *see* J.A. at 46–47, ¶¶ 56–57, and it is apparent to us from their almost total focus on Christopher's three day custody that the Jordans, if anything, are primarily pressing an as-applied challenge, they purport to discuss in their briefs exclusively a facial challenge to the section. *See, e.g.,* Appellants' Br. at 9, 17; Appellants' Reply Br. at 7–8, ("the Jordans' challenge here is solely to that *three to four day period* allowed ...") (emphasis added). Perhaps aware of the appellants' confusion, the district court read the amended complaint as challenging the statute both facially and as applied, *see* J.A. at 74, 76, and considered both claims, *see id.* at 76–78. For this reason, we also address both types of challenge to the statute.

(plurality); *Smith v. Organization of Foster Families,* 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977), borders on understatement. The unitary family is the foundation of society. Through the intimate relationships of the family, our children are nurtured, tutored in the values and beliefs of our society, and prepared for life. *See Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979) ("[P]arents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.' ") (quoting *Pierce,* 268 U.S. at 535, 45 S.Ct. at 573). Through these relationships, our children—indeed, we, as parents—are strengthened, fulfilled and sustained. The bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons.[10]

Where the state seeks to interfere with these "essential," *Meyer,* 262 U.S. at 399, 43 S.Ct. at 626, or "fundamental," *Santosky,* 455 U.S. at 753, 102 S.Ct. at 1394, parental rights, its action must satisfy the procedural strictures of the Due Process Clause. *Cf. id.; Lassiter v. Dep't of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Due process, however, does not always require prior process. *See FDIC v. Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 1787, 100 L.Ed.2d 265 (1988) ("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation."); *see also United States v. James Daniel Real Property,* — U.S. —, —, 114 S.Ct. 492, 501, 126 L.Ed.2d 490 (1993) (hearing may be postponed until after the event in extraordinary situations) (citing *Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 (1972)). And, as appellants concede, it is well-settled that the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child, *see Weller v. Dep't of Social Services,* 901 F.2d 387, 393 (4th Cir.1990); *Doe v. Hennepin County,* 858 F.2d 1325, 1329 (8th Cir. 1988), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3161, 104 L.Ed.2d 1023 (1989); *Donald v. Polk County,* 836 F.2d 376, 380–81 (7th Cir. 1988); *Hooks v. Hooks,* 771 F.2d 935, 942 (6th Cir.1985); *Duchesne v. Sugarman,* 566 F.2d 817, 826 (2d Cir.1977), provided that adequate post-deprivation process to ratify the emergency action is promptly accorded. *See Weller,* 901 F.2d at 396; *Hennepin County,* 858 F.2d at 1329.

1.

Notwithstanding the fundamental interests affected by the emergency removal of a child from his home, we have little difficulty rejecting the Jordans' facial challenge to Virginia Code § 63.1–248.9(A)(6). As the Supreme Court has repeatedly observed,

> [a] facial challenge to a legislative Act is, of course, the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact the [relevant statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since ... an "over-

10. There is some question over the precise legal character of the child's liberty interest implicated by the assumption of his custody by the state since, as a minor, he will always be in someone's custody. *See Donald v. Polk County,* 836 F.2d 376, 380 n. 5 (7th Cir.1988); *Lossman v. Pekarske,* 707 F.2d 288, 290 (7th Cir.1983). The Supreme Court, however, has held that the confinement of children must be accompanied by procedural due process, thus recognizing at least a limited liberty interest on their behalf independent of that of their parents. *See Schall v. Martin,* 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984) (preventive pretrial detention); *Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) (commitment to mental institution). Whether, in particular, children (much less their siblings) have cognizable, reciprocal interests in the companionship and supervision of their parents, and in maintaining the emotional bonds that develop within the unitary family has not been decided by the Supreme Court, *see Michael H.,* 491 U.S. at 130, 109 S.Ct. at 2345 (plurality); *Organization of Foster Families,* 431 U.S. at 844, 847, 97 S.Ct. at 2109, 2111, although one court of appeals has stated that they do possess such interests, *see Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977).

breadth" doctrine [has not been recognized] outside the limited context of the First Amendment.

*United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); *see also Schall v. Martin,* 467 U.S. 253, 269 n. 18, 104 S.Ct. 2403, 2412 n. 18, 81 L.Ed.2d 207 (1984). It is possible under Virginia's statutory scheme, as the facts of this case bear out, that as many as three days may pass before judicial review of a removal effected under section 63.1–248.9 is obtained. *See supra* note 8. However, such a delay, contrary to the Jordans' assertions, is manifestly the exception rather than the rule. Section 63.1–248.9 authorizes an emergency removal only when, *inter alia,* "[a] court order is not immediately obtainable," *see id.* § 63.1–248.9(A)(2), and then only if the person or agency assuming custody notifies the court and obtains an emergency removal order "as soon as possible, but in no event later than seventy-two hours," *see id.* § 63.1–248.9(A)(6). A delay of three full days is therefore statutorily authorized only where immediate judicial review is not possible prior to the emergency removal and, due to an intervening back-to-back weekend and holiday, the judges of the Juvenile and Domestic Relations Court are unavailable to consider a removal petition.[11] In all other cases, which appear to be the vast majority, if not almost all instances in which there is an emergency removal, the removal will either have been effected pursuant to a judicial order or will be ratified soon thereafter and in any event well before the expiration of seventy-two hours. For example, if, for some reason, a judicial removal order is not immediately obtainable at a particular time during an ordinary work day, the removing official presumably will be required by the mandate that he obtain an order "as soon as possible," to procure an order during that same or, at the latest, the next business day. If the removal is effected late in the day or after hours on the Friday before an ordinary weekend, or on a Saturday or Sunday of such a weekend, the same statutory mandate will require that an order be secured no later than Monday, if not on the very day of the removal.[12] Given that the delay in judicial review permitted by section 63.1–248.9(A)(6) will be valid in many, if not almost all circumstances, *see Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and discussion *infra* part III.B.2,[13] appellants' facial challenge to the statute cannot be sustained.

2.

The Jordans' challenge to section 63.1–248.9(A)(6) as applied is considerably more troubling than their facial challenge to that section. Their as-applied challenge requires that we decide whether the Constitution permits a state to retain custody of a child removed from his home for some 65 hours over the weekend without judicial re-

11. Even in this circumstance, at least prior to the amendment adding subsection (B), *see supra* note 8, section 63.1–248.9(A)(6) would require judicial ratification of a removal before the expiration of the holiday. For example, if the removal took place after hours on Friday evening, the seventy-two hour period would lapse sometime before the Tuesday business day begins.

12. We have found no Virginia authority interpreting the phrase "as soon as possible" as it appears in section 63.1–248.9(A)(6). Giving the term its ordinary meaning, however, it would appear that removing officials are required to provide notice to the court and arguably to seek judicial ratification of an emergency removal even during weekends and holidays. While all parties before us proceed on the assumption that a judicial order will not issue over the weekend, there is obviously no authority that would prohibit issuance of a removal order itself or an order ratifying a removal, on either Saturday or Sunday. Accordingly, the Commonwealth should not blithely presume in a context as grave as this one where children have been taken from their families by the state that it is free not to seek review before the Monday or next business day following a Friday or weekend removal.

13. The Jordans contend that the district court improperly based its decision on *Newton v. Burgin,* 363 F.Supp. 782 (W.D.N.C.1973), *aff'd,* 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974), instead of considering the *Mathews* factors. We agree that *Newton* is inapposite. In that case, the removal had been effected pursuant to an *ex parte* judicial order and the question presented was the permissible length of delay in providing a full adversarial hearing. Although *Newton* was decided three years before *Mathews,* its analysis appears to incorporate essentially all the factors set forth in *Mathews. See id.* at 788.

view of the protective removal.[14] This question also, surprisingly, appears to be one of first impression in the federal courts. Fully aware of the gravity of the question presented by any state deprivation of the parental right to custody, we conclude that section 63.1–248.9, as it was applied in this case so as to permit such a delay, does not violate the Due Process Clause of the Fourteenth Amendment.

In deciding whether the challenged delay in judicial review satisfies the flexible demands of procedural due process, we must examine the private and governmental interests at stake, the extent to which those interests are served by the existing procedures, and the costs to the state of instituting the additional procedure sought. Examination of these particular factors is required by *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), where the Supreme Court articulated the factors that must be considered as follows:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 335, 96 S.Ct. at 903. The Court in *FDIC v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), slightly reformulated these factors for use in assessing the permissibility of post-deprivation process delay:

> In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

*Id.* at 242, 108 S.Ct. at 1788. Presumably, this refinement was undertaken out of recognition of the awkwardness of a literal application of the *Mathews* factors in this context. Where the question is not whether there will be post-deprivation review, but the timeliness of such review, it is not meaningful to inquire, as it is in the typical procedural due process context, whether the procedure sought—sooner review—would reduce the likelihood of an erroneous deprivation. The deprivation has already occurred, it is understood that there will be judicial review, and the deprivation, even if in error, cannot be "undone" by sooner judicial review, *cf. James Daniel Real Property,* — U.S. at —, 114 S.Ct. at 502 (delayed post-seizure hearing "will not cure the temporary deprivation that an earlier hearing might have prevented" (quoting *Connecticut v. Doehr,* — U.S. —, —, 111 S.Ct. 2105, 2108, 115 L.Ed.2d 1 (1991)). At most, the risk of an extended erroneous deprivation could be reduced. The more relevant questions therefore are the harm to the private interests that will be occasioned by the delay in review and the state's justifications for the delay.

It is beyond question, as discussed *supra,* that the adult Jordans' parental rights implicated by the challenged delay are commanding and deserving of the greatest solicitude.

14. The Jordans' complaint states that Christopher was taken into custody between 4:45 and 5:15 p.m. Friday afternoon. It is not entirely clear from the record precisely when on Monday Christopher was returned to the custody of his parents. Nor is it clear precisely what kind of hearing preceded his return. Appellees contend that Christopher was returned on Monday after the case was presented to a Juvenile Court judge. Appellees' Br. at 13. The Jordans are coy as to the representation concerning the hearing, although they do not appear to dispute this statement by the defendants. Their complaint alleges only that Christopher was returned on Monday, "defendants having failed or refused, in the interim, to present the case for a hearing *on the propriety of the detention or any charge of alleged child neglect.*" J.A. at 38, ¶ 30 (emphasis added). Because it appears that Christopher was returned sometime before noon on Monday, with some kind of judicial action having been taken, we will assume that approximately 65 hours lapsed before such review as occurred prompted his return. Our conclusion as to the constitutionality of the delay would not be different, however, if this review occurred and Christopher was returned instead on Monday afternoon, as many as 72 hours after his removal.

The forced separation of parent from child, even for a short time, represents a serious impingement on those rights. Similarly, delay implicates the child's interests in his family's integrity and in the nurture and companionship of his parents. *Cf. Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) (typically a child's interests are "inextricably linked" with those of the parents); *see supra* note 10. Of course, the child also has obvious and compelling interests in his personal welfare and safety, which are opposed to those of his parents when they pose the threat to the child's safety.

These substantial private interests are not without public counterpart in the context of protective custody by the state. The Commonwealth as *parens patriae* also has at stake compelling interests—those in the safety and welfare of its children. *See, e.g., Lassiter v. Dep't of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981); *see also Santosky,* 455 U.S. at 766, 102 S.Ct. at 1401; *Parham,* 442 U.S. at 603, 99 S.Ct. at 2504 ("[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."). Indeed, the state also shares the interest of the parent and child in their family's integrity, *see Santosky,* 455 U.S. at 766–67, 102 S.Ct. at 1401–02 ("the *parens patriae* interest favors preservation, not severance, of natural familial bonds"), because the welfare of the state depends in large part upon the strength of the family.

We need not attempt to determine which of these significant private and public interests is the weightier. It is evident from the magnitude of these interests implicated by the emergency removal of a child from the custody of his parents that the Jordans and the Commonwealth share the same concern that such removals not be effected or continued in error. *Lassiter,* 452 U.S. at 27, 101 S.Ct. at 2159; *Stanley v. Illinois,* 405 U.S. at 652, 92 S.Ct. at 1212 ("[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents."); *see also Santosky,* 455 U.S. at 766–67, 102 S.Ct. at 1401–02. The focus of our inquiry therefore becomes the likelihood that the state's removal of a child under the authority of section 63.1–248.9 will have been without cause, the strength of the state's justification for the delay, and the closeness of the relationship between this justification and the government's underlying interest. No less so than in any other context, the costs to the government—economic and non-economic—that would be incurred by a constitutional requirement of immediate review must also be considered.

While there is always a risk of error when an emergency removal of a child from his parents' custody is required, the Commonwealth has substantially reduced that risk at the threshold by the imposition of significant substantive limitations upon the removal authorization. The removal power is confined to extraordinary circumstances by section 63.1–248.9 itself. Pursuant to Va.Code § 63.1–248.9(A)(1), in order to effect an emergency removal, the removing official must determine that "[t]he circumstances of the child are such that continuing in his place of residence or in the care or custody of the parent ... presents an *imminent danger to the child's life or health to the extent that severe or irremediable injury would be likely to result....*" *Id.* (emphasis added); *see also id.* § 16.1–251(A)(1) (emergency removal order: "child would be subjected to an imminent threat to life or health to the extent that severe or irremediable injury would be likely to result if the child were returned or left in the custody of his parents...."); *id.* § 16.1–252(E)(1) (same for preliminary removal order). Thus, only where a child's life is in imminent danger or where there is imminent danger of severe or irremediable injury to the child's health (and prior judicial authorization is not immediately obtainable) may an official summarily assume custody of a child from his parents. *Id.* § 63.1–248.9(A)(1), (2). These substantive limitations on the removal power, because they establish such a stringent showing as a precondition to an emergency removal, ensure to a significant extent, we believe, not only that the power will be exercised sparingly, but also that it will, with few exceptions, be used appropriately. *Compare, e.g., Donald v. Polk County,* 836 F.2d 376, 384 (7th Cir.1988) (assumption of custo-

dy permissible upon finding of only probable cause to believe child would be subject to injury by others).

The Commonwealth has heavily conditioned even this limited authority through imposition of a series of procedural requirements that must attend and follow an emergency removal. The parents must be notified "as soon as practicable" that their child is in custody. Va.Code § 63.1–248.9(A)(4). A report must be prepared and submitted to the local Department of Social Services. *Id.* § 63.1–248.9(A)(5). The person having custody must obtain from the Juvenile and Domestic Relations Court either an emergency removal order under Virginia Code § 16.1–251, or a preliminary removal order under § 16.1–252. For either, a judge must determine that returning the child to the care of his parents would subject him to an imminent threat of serious harm to his life or health. *See id.* §§ 16.1–251(A)(1) & –252(E)(1). The judge must further conclude that no less drastic measures would sufficiently protect the child. *See id.* §§ 16.1–251(A)(2) & –252(E)(2). And, as we have discussed, as an absolute constraint on the duration of unreviewed state custody, at least *ex parte* judicial review to ratify the initial removal decision must be obtained "as soon as possible," but in any event within seventy-two hours. *Id.* § 63.1–248.9(A)(6). The fact of certain and prompt review by superiors and, indeed, a court, not to mention the scrutiny that parental notification assures, is bound to discipline the exercise of the emergency removal power even more, further reducing the risk that the initial removal will be effected without cause. *Cf. Spiegal v. Ryan,* 946 F.2d 1435, 1440 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992) (agency decision, made by head of agency and supported by factual findings, provided "substantial assurance" that the deprivation was "not baseless or unwarranted").

The risk of error inherent in the Commonwealth's emergency removal procedure is limited also by the character of the inquiry that must be undertaken. *See Mathews,* 424 U.S. at 343, 96 S.Ct. at 907 ("Central to the evaluation of any ... process is the nature of the relevant inquiry."). Whether the child is subject to imminent danger to his life or is in imminent danger of irreparable injury to his health is a sharply focused factual determination essentially free of the kind of subjective judgments that are peculiarly susceptible to error, and about which the Court has often expressed concern. *Cf. Mallen,* 486 U.S. at 245, 108 S.Ct. at 1790 (erroneous suspension of bank officer unlikely where standard for suspension satisfied by readily ascertainable objective facts). This determination is dissimilar, for example, to the legal determination of probable cause necessary for civil forfeiture, *cf. James Daniel Real Property,* — U.S. at —, 114 S.Ct. at 502, to the typically complex determination of welfare entitlement, *cf. Mathews,* 424 U.S. at 343, 96 S.Ct. at 907, or to the parental fitness determination at issue in *Santosky,* 455 U.S. at 762 & n. 12, 102 S.Ct. at 1399 & n. 12; *see also Duchesne v. Sugarman,* 566 F.2d at 828–29 & n. 26, and can readily and accurately be made by a physician or adequately trained DSS worker. *Cf. Parham,* 442 U.S. at 607, 613, 99 S.Ct. at 2506, 2509–10 (risk of erroneous voluntary commitment through reliance on judgments of qualified psychiatrists not significantly reduced by requirement of judicial-type hearing).

We recognize that there will yet be circumstances in which a removal ultimately will be proven to have been unjustified and that in these cases any delay prior to judicial review will have prolonged the deprivation of rights occasioned by the erroneous removal. However, given the stringent limitations placed on the authority to remove a child in the first place, the nature of the underlying determination that must be made, and the certainty of the almost immediate review that the removing officials know follows every emergency removal, we believe that these cases will be fairly infrequent.

While the likelihood that the interim decision to remove a child will have been without cause is relatively low, the state's proffered justification for the weekend delay—the desire to have removal decisions reviewed by its judicial officers, who may be unavailable on Saturdays and Sundays—is sound and the relationship of this justification to the afore-

mentioned state interests is direct. The Commonwealth has deliberately committed the review of emergency removals exclusively to judges of the Juvenile and Domestic Relations court because of the importance of the interests, both public and private, that are implicated by a removal decision. *See* Va.Code §§ 16.1–251(A) & –252(A); *Juvenile and Domestic Relations District Courts: Only Judge, and Not Intake Officer, May Issue Emergency Removal Order,* 1979–80 Op.Va.Att'y Gen. 208 (1979). It has specifically entrusted this decision to its judges over administrative intake officers and magistrates who, while qualified to act in matters involving the detention of juvenile delinquents, *see, e.g.,* Va.Code §§ 16.1–248.1(A) & –255, may be unfamiliar with the peculiar concerns present in cases of abused or neglected children removed from their surroundings for their own safety. *Cf. Mallen,* 486 U.S. at 244, 108 S.Ct. at 1789 ("The magnitude of the public interest in a correct decision counsels strongly against any constitutional imperative that might require overly hasty decisionmaking."). This legislative judgment is unassailable. Review of the Commonwealth's decision to take a child into protective custody necessarily entails a decision as to whether to maintain the child in the care of the state or to return him to his parents. As we have discussed, the most basic rights of the individual and the state lie in the balance when this decision is made. Of course, if made in error, a decision to release a child from protective custody carries with it the almost unthinkable consequence of returning the child to parents in whose custody the child's life may be in danger. Nor is there any question that the required close nexus exists between the state's justification and the interests it seeks to protect by ensuring that these decisions are made only by its courts.

To be sure, the Commonwealth could, if necessary, *see supra* note 12, require that its judicial officers be available at all times over the weekend to consider immediately the state's removal decisions. We are not sure that this would not be wise policy given the intrusion represented by the state's removal of a child from the custody of his parents. Nor do we think that the costs of such a policy are an especially compelling argument against such a requirement. Requiring review by the judges of the Juvenile Court on weekends no doubt would impose additional administrative and financial burdens on the Commonwealth. We are not convinced, however, that the burden of providing at least *ex parte* judicial review at such times would be prohibitive, notwithstanding the Supreme Court's truism that the constitutionalizing of administrative procedures often results in substantial financial and administrative costs, *see Mathews,* 424 U.S. at 347, 96 S.Ct. at 908. In fact, were we at this juncture of the analysis concerned solely with policy or with dollars and cents, we almost certainly would strike the balance in favor of a requirement of judicial review at least sooner than that afforded the Jordans where a removal is effected shortly before or during a weekend.

The Supreme Court, however, has repeatedly admonished both that the requirements of procedural due process are flexible, *see, e.g., Mathews,* 424 U.S. at 334, 96 S.Ct. at 902; *County of Riverside v. McLaughlin,* 500 U.S. 44, ——, 111 S.Ct. 1661, 1668, 114 L.Ed.2d 49 (1991) ("[T]he Constitution does not impose on the States a rigid procedural framework."); *Schall v. Martin,* 467 U.S. 253, 275, 104 S.Ct. 2403, 2415, 81 L.Ed.2d 207 (1984); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), and that considerable deference must be accorded the delicate judgments made by responsible state officials. Perhaps in no context is this truer than where the state is acting as *parens patriae* to protect children from imminent danger. "This area has been left to the States from time immemorial, and not without good reason." *Santosky,* 455 U.S. at 770, 102 S.Ct. at 1403–04 (Rehnquist, J., dissenting); *cf. United States v. Yazell,* 382 U.S. 341, 352, 86 S.Ct. 500, 506, 15 L.Ed.2d 404 (1966). In this area especially, while of course clear constitutional requirements cannot be ignored, *see Santosky,* 455 U.S. at 771, 102 S.Ct. at 1404 (Rehnquist, J., dissenting), "substantial weight must be given to the good-faith judgments of the individuals [administering a program] ... that the procedures they have provided assure fair consideration of the ... claims of individu-

als," *id.* (quoting *Mathews,* 424 U.S. at 349, 96 S.Ct. at 909).

Here, the Commonwealth has determined that its substantial interests, as well as those of the concerned parents and children, are best served by requiring section 63.1–248.9 emergency removals made immediately prior to or during weekends to be reviewed, by a qualified judge, on the next business day. As noted, were we legislators, we might require, if not immediate judicial review, then such review sooner than that afforded appellants, regardless of the difficulties or costs of providing appropriate review during evenings and weekends. However, we are judges, and as such, our authority is properly confined to interpretation of the laws. *See Lassiter v. Dep't of Social Services,* 452 U.S. 18, 33, 101 S.Ct. 2153, 2162, 68 L.Ed.2d 640 (1981) ("A wise public policy ... may require that higher standards be adopted than those minimally tolerable under the Constitution."). According the Commonwealth's judgment the deference it is entitled, we cannot say that the state transgressed upon the Constitution by failing to provide the Jordans judicial review of the state's protective removal of their child until the next judicial business day, approximately 65 hours after the child's removal. *See County of Riverside,* 500 U.S. at ——, 111 S.Ct. at 1671 (applauding states that required immediate probable cause determinations, but noting that the "Constitution [did] not compel so rigid schedule"). The state's legislative judgment allowing a delay of approximately this amount of time over an intervening weekend in order to ensure judicial review of removal decisions, which was obviously made after considerable and careful deliberation, we believe represents a permissible balancing of the substantial private and governmental interests at stake. It respects the Jordans' undisputed interest in custody of their child, without jeopardizing the considerable state interest in the protection of children from life-threatening abuse. Especially given the enormity of the potential consequences of an erroneous *return* of a child to an abusive family, we cannot say that the requirements of procedural due process demand more where a removal is effected shortly before or during a weekend. *Cf. Mallen,* 486 U.S. at 243, 108 S.Ct. at 1789 (stating that where there is doubt as to whether revoking bank officer's suspension would be in the public interest, "the agency may give greater weight to the public interest and leave the suspension in place").[15]

In reaching this conclusion, we agree with the Jordans, *see also Duchesne v. Sugarman,* 566 F.2d 817, 828 n. 24 (2d Cir.1977), that the Supreme Court's decision in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), is instructive in assessing the constitutionality under the Fourteenth Amendment of the delay in judicial review experienced by the Jordans. In *Gerstein,* the Supreme Court held that the Fourth Amendment requires a "prompt" judicial determination of probable cause as a prerequisite to any extended pretrial detention of an adult suspected of committing a crime. *Id.* at 125, 95 S.Ct. at 869. Prompt review was defined in *County of Riverside v. McLaughlin,* 500 U.S. 44, ——, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991), a case not even cited by appellants, to require a probable cause hearing within 48 hours of arrest, absent extenuating circumstances. Promptness is the touchstone of the Fourteenth Amendment analysis into the timeliness of post-deprivation review, as well as the Fourth Amendment inquiry into the constitutionality of delay in an independent probable cause determination. *See Barry v. Barchi,* 443 U.S. 55, 64, 66, 99 S.Ct. 2642, 2649, 2650, 61 L.Ed.2d 365 (1979) (citing *Gerstein* as analogous authority that prompt judicial or administrative hearing is required following deprivation of property interest); *Mallen,* 486 U.S. at 241–42, 108 S.Ct. at 1788–89 ("[T]he District Court was properly concerned about the importance of providing prompt post-deprivation procedures in situations in which an agency's discretionary impairment of an individual's property is not preceded by any opportunity for a pre-deprivation hearing.")

15. The 65 hours authorized in this case by section 63.1–248.9(A)(6) stands in marked contrast to delays that have been found to be unconstitutional. *Compare Weller v. Dep't of Social Services,* 901 F.2d at 396 (4 months); *Duchesne v. Sugarman,* 566 F.2d at 826 (36 months); *Hooks v. Hooks,* 771 F.2d at 942 (hearing never provided). *See also infra* notes 17–19.

(citation omitted); *James Daniel Real Property*, —— U.S. at ——, 114 S.Ct. at 501 (whether pre-seizure process necessary depends on "interests at stake, along with the promptness and adequacy of later proceedings"); *Weller*, 901 F.2d at 396 ("prompt" initiation of judicial proceedings to ratify emergency removal of child from parents' custody required).

We disagree with the Jordans, however, to the extent they suggest that *Gerstein* (and *County of Riverside*) is dispositive of the issue before us. An arrest is virtually a complete deprivation of a person's liberty. The infringement of parental liberty that results from an emergency removal, although unquestionably significant and perhaps in some ways even more emotionally traumatic, is less comprehensive in scope than that resulting from an arrest. *See Gerstein*, 420 U.S. at 114, 95 S.Ct. at 863 (noting that pretrial detention "may imperil the suspect's job, interrupt his source of income, and impair his family relationships"); *cf. Santosky*, 455 U.S. at 759, 102 S.Ct. at 1397 (noting that a proceeding to terminate parental rights "seeks not merely to infringe that fundamental liberty interest, but to end it"). This difference in the extent of the liberty deprivation between the arrestee and the parent whose child is removed under the authority of section 63.1–248.9, we are satisfied, can justify at least the incremental additional time (less than one day) prior to post-deprivation review at issue here, particularly given the magnitude of the state's interest in the welfare of its children and the unthinkable consequence of a premature, erroneous return of a child to the custody of parents in whose custody the child's life might be in imminent danger. *County of Riverside* did not lay down a categorical rule even for adult criminal arrestees that a probable cause determination must be made before the expiration of 48 hours. 500 U.S. at ——, 111 S.Ct. at 1670. Additionally, although in *County of Riverside* the Supreme Court stated that an intervening weekend is not an extraordinary circumstance that could justify delaying a probable cause hearing beyond the 48 hours specified as the general limit by the Court, *see id.*, to the extent that the period of delay that we approve today is attributable to an intervening weekend, we believe this additional delay is also constitutionally permitted as a consequence of the differences between the criminal processes and the civil removal processes. Unlike the machinery of the criminal justice system, the operations of the family court and its adjuncts are not ordinarily required to be in operation 24 hours a day, 7 days a week.

It may be that *Gerstein* and *County of Riverside* are, in principle at least, more relevant to the claims asserted by Christopher, who, like the arrestees, found himself in the full custody of the state. His claim fails under these authorities, however, for quite different reasons. When the state acts as *parens patriae*, as it did when it removed Christopher, it does so to protect a child from parents who pose a serious threat to the child's life or health. Although under section 63.1–248.9 the endangered child is placed in some form of state custody, the Commonwealth stands not as his adversary, as it does for the adult accused of crime, but as his protector. *Cf. Schall*, 467 U.S. at 263, 104 S.Ct. at 2409 ("The State has a *parens patriae* interest in preserving and promoting the welfare of the child, ... which makes a juvenile proceeding fundamentally different from an adult criminal trial.") (citation omitted). Custody is assumed not to be a preliminary step to punishment, but as a measure intended to avert impending and serious danger to the innocent child.

Relatedly, children taken into custody under section 63.1–248.9, unlike the adults in *Gerstein* and *County of Riverside*, are not prisoners of the state. Section 63.1–248.-9(A)(3) does not specify where children are to be placed following an emergency removal. Section 16.1–251(A), however, suggests that such children will be placed in "shelter care," which is in turn defined as the "temporary care of children in physically unrestricting facilities," *id.* § 16.1–228, and is distinguished by statute from both "detention home" and "jail." *See id.* These profound differences between arrest and protective custody, and between the treatment accorded children taken into protective custody and adults arrested on suspicion of crime, clearly render *Gerstein* and *County of Riverside* noncon-

trolling of a claim by a child of whom the state has assumed protective custody. Indeed, the Supreme Court has always recognized that the interests of a child in freedom from constraint, the infringement upon which by protective custody necessarily implicates any constitutional right in family integrity possessed by the child, is attenuated by the fact that, unlike adults, children are always in the custody either of their parents or the state as *parens patriae*. *See Reno v. Flores,* — U.S. ——, ——, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993); *Schall,* 467 U.S. at 265, 104 S.Ct. at 2410; *Lehman v. Lycoming County Children's Services,* 458 U.S. 502, 510–11, 102 S.Ct. 3231, 3236–37, 73 L.Ed.2d 928 (1982).

Given the extraordinary circumstances to which the emergency removal power of section 63.1–248.9 is limited, the reduced likelihood that the interim decision was in error owing to the nature of the determination that must be made and the extent and certainty of the review that follows, and the significant interests of the Commonwealth in the safety and welfare of its children and in having those interests guarded by judicial officers, we conclude that the 65–hour delay in judicial review of Christopher Jordan's emergency removal, over a weekend, which was authorized by section 63.1–248.9(A)(6), did not unconstitutionally infringe upon the Jordans' substantial private interests in their family's integrity. We suggested as much three years ago in our decision in *Weller,* 901 F.2d at 393 (noting that Maryland's protective custody statutes "may well be constitutionally adequate" because they provided for a hearing before or shortly after an emergency removal of a child from his parents' custody).[16] We believe this period is near, if not at, the outer limit of permissible delay between a child's removal from his home and judicial review. A delay of this length, absent extraordinary circumstances, for example, *cf. County of Riverside,* 500 U.S. at ——, 111 S.Ct. at 1670 ("bona fide emergency or other extraordinary circumstance" must be shown to justify delay greater than 48 hours), most certainly would be difficult to justify under either the statute or the Constitution (if it could be justified at all) where a removal is effected other than during, or shortly prior to, a weekend, as the Commonwealth has recognized through its statutory scheme. We are not prepared to say, however, that a delay of this length over an ordinary weekend is so offensive to principles of fairness as to require its invalidation under the Constitution.

Our conclusion that the balance struck by the Commonwealth of Virginia between the private and public interests is compatible with the requirements of procedural due process is reinforced by the fact that states across the country have struck the same or a similar balance when confronted with the identical question. Virginia's judgment that judicial review may be delayed over a weekend without compromising the procedural due process rights of parents or children is shared by well over a majority of the states, according to our survey of the 50 state statutes addressing this issue. Twenty-nine states, in addition to Virginia, permit a child to be maintained in protective custody over a weekend without judicial review having been either obtained or sought,[17] and five more

16. It appears that the Seventh Circuit in *Donald v. Polk County* might have approved an identical delay following a protective removal. *See* 836 F.2d 376, 381 (1988) ("Similarly, given the emergency context, the delay in the present case does not support a constitutional claim."). Ultimately however, it cannot be ascertained whether that court was approving the three day delay prior to the hearing or only the delay in a hearing until after the removal had been effected. The court even could have been approving merely the delay in notification of the parents that the removal had occurred. That the court framed the questions before it as only whether "the Department took [the child] into custody without prior notice to her parents or any opportunity for a pre-taking hearing," *see id.* at 379, suggests that the court was concerned only with one of the latter two questions.

17. Nine states allow custody for up to three days over a weekend without a court order. *See* Ala. Code § 26–14–6 (1992) (72 hours); Ark.Code Ann. § 12–12–516 (Michie Supp.1993) (72 hours, but extended to next business day if 72 hours expires on weekend or holiday); Kan.Stat.Ann. § 38–1542 (Supp.1992) (48 hours, excluding Saturdays, Sundays and holidays); Me.Rev.Stat. Ann. tit. 22, § 4023 (West 1992) (72 hours); Or.Rev.Stat.Ann., § 419.577 (Supp.1992) (24 hours, excluding Saturdays, Sundays and holidays); S.D.Codified Laws Ann. § 26–7A–14 (1992) (48 hours, excluding Saturdays, Sundays and holidays); Utah Code Ann. § 78–3a–30

states do not mandate that review be conducted before the expiration of the weekend; but do require that it be sought.[18] Only 15 states require that independent review of a removal effected late on a Friday be obtained before the following Monday.[19] "The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental.' *Snyder v. Massachusetts,* 291 U.S. 97, 105 [54 S.Ct. 330, 332, 78 L.Ed. 674] (1934)." *Leland v. Oregon,* 343

(Supp.1993) (48 hours, excluding Saturdays, Sundays and holidays); Wash.Rev.Code Ann. (West Supp.1993) § 13.34.060 (72 hours, excluding Saturdays, Sundays and holidays); W.Va. Code § 49-6-9 (1992) (96 hours; petition must be filed forthwith).

Ten states allow custody for up to three days over a weekend without a hearing. *See* Idaho Code § 16-1612 (Supp.1993) (hearing within 48 hours, excluding Saturdays, Sundays and holidays); Ill.Ann.Stat. ch. 705, § 405/2-9 (Smith-Hurd 1992) (hearing within 48 hours, excluding Saturdays, Sundays and holidays); Md.Cts. & Jud.Proc.Code § 3-815 (Supp.1993) (petition must be filed immediately; hearing on next court day); Nev.Rev.Stat.Ann. § 432B.470 (Michie 1991) (hearing within 72 hours, excluding Saturdays, Sundays and holidays); N.J.Rev.Stat.Ann. § 9:6-8.31 (West 1993) (hearing on next court day); Okla.Stat.Ann. tit. 10, § 1107 (West Supp. 1994) (immediate report; hearing within 2 judicial days); 42 Pa.Cons.Stat.Ann. § 6332 (1982 & Supp.1993) (hearing within 72 hours); Tenn. Code Ann. § 37-1-117 (1992) (hearing within 3 days, excluding Saturdays, Sundays and holidays); Tex.Fam.Code Ann. § 17.03 (West 1993) (hearing on first working day); Wyo.Stat. § 14-6-209 (Supp.1992) ("prompt" petition; hearing within 72 hours).

Eight states do not specify when judicial review is to occur, but would allow the weekend to pass before requiring a petition to be filed. *See* Ariz.Rev.Stat.Ann. §§ 8-223, 8-546.08 (Supp. 1993) (petition must be filed within 48 hours, excluding Saturdays, Sundays and holidays); Cal.Welf. & Inst.Code § 313 (West 1984) (petition must be filed within 48 hours, excluding nonjudicial days); Conn.Gen.Stat.Ann. § 17a-101 (West 1992 & Supp.1993) (petition must be filed within 96 hours); Haw.Rev.Stat. § 587-21 (Supp.1992) (petition must be filed within 48 hours, excluding Saturdays, Sundays and holidays); Iowa Code Ann. § 232.79 (West 1985 & Supp.1993) (immediate report; petition must be filed within 3 days); Mass.Gen.Laws Ann. ch. 119, § 51B (West Supp.1993) (petition must be filed on next court day); Minn.Stat.Ann. § 260.-171 (West 1992) (petition must be filed within 72 hours, excluding Saturdays, Sundays and holidays); S.C.Code.Ann. § 20-7-610 (Law Co-op. Supp.1990) (petition must be filed on or before next working day).

Two more states require only that a petition be filed "forthwith." *See* Del.Code Ann. tit. 10, § 933 (Supp.1992) (petition must be filed "forthwith"); N.Y.Fam.Ct. Act §§ 1026-27 (McKinney Supp.1993) (petition must be filed "forthwith"; hearing "as soon as practicable").

18. *See* Alaska Stat. § 47.10.142 (1990) and Alaska Children In Need of Aid Ct.R. 10(a)(1) (West 1992) (petition must be filed within 12 hours; hearing required within 48 hours, excluding weekends and holidays); Ky.Rev.Stat.Ann. § 620.040 (Michie Supp.1992) (order must be requested within 12 hours); Mont.Code Ann. § 41-3-301 (1991) (petition must be filed within 48 hours); N.M.Stat.Ann. § 32A-3B-4 (Westlaw 1993) (petition must be filed within 48 hours); N.C.Gen.Stat. § 7A-572 (1989) (petition must be filed within 12 hours).

19. Four states limit custody without a court order to 48 hours or less. *See* Miss.Code Ann. § 43-21-303 (1981) (24 hours); Mo.Ann.Stat. § 210.125 (West 1983) (24 hours); Neb.Rev.Stat. § 43-250 (1988) (48 hours); R.I.Gen.Laws § 40-11-5 (Supp.1992) (48 hours).

Two more require a hearing before the expiration of a typical weekend. *See* Fla.Stat.Ann. § 39.402 (West 1988 & Supp.1993) (hearing within 24 hours); N.H.Rev.Stat.Ann. § 169-C:6 (1990) (hearing within 24 hours, excluding Sundays and holidays).

Nine states require immediate review, either by a judge, *see* Colo.Rev.Stat. §§ 19-3-403, -405 (Supp.1992) (*ex parte* order available by telephone at all times; hearing within 48 hours, excluding Saturdays, Sundays, and legal holidays); La.Children's Code art. 621 (West 1993) (instanter order required prior to custody by department of social services); Vt.Stat.Ann. tit. 33, §§ 5513, 5515 (1991) (court order required prior to custody in authorized facilities; hearing within 48 hours), or by a court intake officer, *see* Ga.Code Ann. § 15-11-21 (Michie 1990) (decision by intake officer; hearing within 72 hours, excluding Saturdays, Sundays and holidays); Ind.Code Ann. § 31-6-4-6 (Supp.1993) (decision by intake officer; hearing within 72 hours, excluding Saturdays, Sundays and holidays); Mich. Comp.Laws Ann. § 712A.14 (West 1993) and Mich.Ct.R. 5.965 (West 1990) (decision by intake officer; hearing within 24 hours, excluding Sundays and holidays); N.D.Cent.Code § 27-20-17 (1991) (decision by intake officer; hearing within 96 hours); Ohio Rev.Code Ann. § 2151.314 (1990) (decision by intake officer; hearing within 72 hours); Wisc.Stat. #8E8E #48.205, 48.21 (1987 & Supp.1993) (decision by intake worker;

U.S. 790, 798, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302 (1952) (*quoted in Schall,* 467 U.S. at 268, 104 S.Ct. at 2412). *See also Santosky,* 455 U.S. at 769, 102 S.Ct. at 1403 (emphasizing that a majority of states had adopted "clear and convincing evidence" standard).

B.

In addition to their procedural due process claim, the Jordans also contend that section 63.1–248.9 violates the Equal Protection Clause of the Fourteenth Amendment.[20] In particular, they argue that it is an unconstitutional denial of equal protection for children taken into protective custody under section 63.1–248.9 in order to protect them from imminent harm to be afforded different procedural protections than children taken into custody under Va.Code § 16.1–246(B)–(D) on suspicion of criminal or other misconduct.[21] The district court summarily rejected appellants' argument that the differential treatment of delinquents and neglected children alleged by appellants should be subjected to strict scrutiny, on the sole ground that section 63.1–248.9 did not create a classification based on any traditionally suspect or quasi-suspect characteristic. J.A. at 78. It then reviewed the provision for rationality and concluded that it readily satisfied that standard. *Id.*

Although the two statutory schemes are complex, the general differences about which the Jordans complain between the procedures afforded children taken into protective custody and those afforded children arrested for delinquency can be succinctly stated. A child removed under section 63.1–248.9 just before or during a weekend (or whenever immediate judicial review is not obtainable) may be placed in shelter care on the authority of the removing physician, social worker, or police officer. Thereafter, as we have discussed, an *ex parte* emergency removal order must be obtained from a Juvenile Court judge "as soon as possible," but in any event within seventy-two hours after removal, unless that period expires on a weekend or holiday and is extended to ninety-six hours. *See id.* §§ 63.1–248.9(A)(6) & (B). Conversely, a child arrested under section 16.1–246(B)–(D) during hours when the court is not open, such as after the close of business or on weekends or holidays, may be committed to shelter care only after issuance of an *ex parte* detention order by a juvenile court intake officer pursuant to § 16.1–255. *See id.* § 16.1–247(E)(3).[22] Intake officers, who are juvenile probation officers, *see id.* § 16.1–228, are required to be available to provide a "prompt response" in matters requiring the issuance of detention orders. *See id.* § 16.1–255. If a child is ordered detained by the intake officer, he must thereafter be brought before a Juvenile Court judge for a detention hearing on the next day the court in which the charges are pending sits, or if that court is not sitting the following day, "within a reasonable time, not to exceed seventy-two hours, after he was taken into custody." *See* § 16.1–250(A). If the seventy-two hours expires on a Saturday, Sunday, or holiday, the period within which the child must be brought before a judge is extended to the next business day. *Id.*

hearing within 24 hours, excluding Saturdays, Sundays and holidays).

**20.** We understand the Jordans' facial and as-applied equal protection claims to be indistinguishable.

**21.** Section 16.1–246 authorizes officers to take immediate custody of children whose own behavior or condition present a serious threat to their well-being, *see* Va.Code § 16.1–246(B); who are habitually truant, *see id.;* or who are suspected of crimes, *see id.* § 16.1–246(C)–(D). Other provisions of § 16.1–246 grant officers authority to assume custody of children for whom a detention order or warrant has been issued, *see id.* § 16.1–246(A); who have run away from home or escaped from state custody, *see id.* § 16.1–246(E)–(G); who are unsupervised at night, *see id.* § 16.1–246(G)(ii); or who are mentally ill, *see id.* § 16.1–246(H).

**22.** If not released by the arresting officer, a child arrested under section 16.1–246(B)–(D) must be presented to the Juvenile Court "with all practicable speed". *See id.* § 16.1–247(B). If that court is closed, the child may be held in shelter care after issuance of a detention order by an intake officer, or detained in a secure facility or shelter care upon a warrant from a magistrate. *See id.* § 16.1–247(E). A detention order for shelter care may be issued for a variety of reasons, including, *inter alia,* that the child's parent or guardian cannot be reached or cannot arrive to take custody of the child in a reasonable time. *See id.* § 16.1–248.1(B).

Whether the Jordans contend that the equal protection violation arises specifically because of the assumed differences in the timing of judicial review of the arrest and removal decisions, or merely because an independent review must precede the commitment of a delinquent to shelter care whereas no such review is required for shelter care commitment of the child taken into protective custody, is unclear. *Compare* Appellants' Br. at 23–24 ("The Jordans' third cause of action alleged that Virginia law violated equal protection guarantees in that an allegedly neglected or abused child who is summarily seized may suffer up to a four-day delay in any judicial review, while an allegedly delinquent child summarily taken into custody must have immediate judicial review of his continued detention.") *with* Appellants' Reply Br. at 13 ("The more dramatic distinction between the two statutes [than the difference between the maximum periods before judicial review must occur] ... [is] that the juvenile delinquency law prohibits any child's continued detention without immediate review by a juvenile court official."). Neither contention, however, has merit.[23]

As a threshold matter, we believe that children taken into the Commonwealth's custody to protect them from imminent danger to their lives and children arrested on suspicion of delinquency are, quite simply, not similarly situated. Although Virginia's statutory scheme contemplates that both groups of children may be held in "shelter care," *see* Va.Code §§ 16.1–251(A), –247(E)(3), and thus endure the same deprivation of their liberties, *cf. Foucha v. Louisiana,* — U.S. —, —, 112 S.Ct. 1780, 1788, 118 L.Ed.2d 437 (1992) (insanity acquittees, who are no longer insane, are similarly situated to fully sane convicts who have completed their prison terms), the purposes of that custody, as well as the presumption regarding the Commonwealth's ability to return the children to their parents, are quite different. When the Commonwealth takes protective custody of a child, it acts as *parens patriae* to protect an innocent child from the potentially harmful acts or omissions of his parents. When the Commonwealth detains a child for alleged delinquency, it acts as *parens patriae* as well, but it also exercises its police power against a potentially culpable child for his own acts, largely to protect others from him. Custody in such a case is a preliminary step in not just the protection of the child, but also in his correction and, possibly, punishment. Moreover, for the child in protective custody, the presumption is that he cannot be safely returned home because his parents pose a threat to his health, if not to his life. The opposite presumption obtains for the juvenile delinquent; for him, there is every reason to believe not only that he can safely be returned to the custody of his parents, but that he should be returned to their custody; in fact it is contemplated that the delinquent's parents, upon his return, will assume their customary role in the discipline and reform of the child. The law is not required to treat these two differently situated classes of children identically.

Even assuming that children taken into protective custody and juveniles arrested on suspicion of delinquency could be considered in relevant respects to be similarly situated, the Jordans still cannot prevail in their equal protection claim. To the extent that the Jordans argue that there are differences between these two groups of children in terms of the length of permissible custody before *judicial* review is required, we disagree that the statutory scheme even classifies the delinquent and the neglected child differently. The requirements for judicial review under both schemes—insofar as arrests and removals occurring after hours or on weekends or holidays are concerned—are, as the Commonwealth notes, almost identical. And any differences would appear, contrary to appel-

23. It appears from the parties' briefs that the Jordans initially claimed that differences in the delay before judicial review were at the heart of their equal protection claim, *see* Appellants' Br. at 24, and that when appellees explained that the delay in judicial review for the two groups of children was essentially the same, *see* Appellees' Br. at 18; *see also* discussion *infra,* appellants shifted the focus of their argument to the lack of administrative review accorded abused children. This argument sounds more in procedural due process than in equal protection, but we can think of no reason why this claim cannot properly be considered under the Equal Protection Clause.

lants' assertion, *see* Appellants' Reply Br. at 12, to favor children over whom the state has asserted protective custody. Section 63.1–248.9(A)(6) not only requires judicial review "as soon as possible" instead of "within [a] reasonable time" as provided under § 16.1–250(A), it also sets forth an absolute maximum period of ninety-six hours within which judicial review must occur. The requirement that the state obtain judicial review "as soon as possible," unlike the requirement that it do so "within [a] reasonable time," at least arguably imposes upon the state a continuing obligation to attempt to obtain judicial ratification of a removal throughout the weekend and on holidays. *See supra* note 12. The ninety-six hour maximum period between assumption of custody and review under section 63.1–248.9 likewise requires judicial review sooner than that required under section 16.1–250(A), which could permit as many as 120 hours to lapse if, for example, custody were taken late on Wednesday afternoon before a Thursday and Friday holiday, such as Thanksgiving.[24]

To the extent the Jordans argue that the Equal Protection Clause is violated by the absence from section 63.1–248.9 (and the presence in section 16.1–247(E)(3)) of a requirement of administrative intake officer review prior to continued detention, we reject this claim as well. Although the district court appeared to believe that only classifications along traditionally suspect lines enjoy strict scrutiny, the government also cannot, without a compelling reason, classify similarly situated persons in a way that directly and significantly interferes with one class' ability to exercise fundamental rights. *See, e.g., Zablocki v. Redhail,* 434 U.S. 374, 383, 388, 98 S.Ct. 673, 679, 682, 54 L.Ed.2d 618 (1978) (impediment to marriage); *Foucha v. Louisiana,* — U.S. at —, 112 S.Ct. at 1788 (indefinite detention); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (impediment to interstate travel); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (sterilization). The Virginia statutes at issue here might be thought to classify the delinquent and the abused child in terms of their interests in freedom from physical restraint and, therefore, also in terms of their respective interests in their families' integrity (assuming that a child has such a cognizable interest, *see supra* note 10), because the erroneous custodial decision may be identified sooner for the delinquent than for the neglected child. Even assuming that they do, however, we do not believe that any resulting infringement on the rights of the child taken into protective custody is constitutionally problematic. We question whether a state ever directly infringes on a right when, rather than affirmatively imposing an impediment to the exercise of the right, it merely declines to provide a particular procedural protection to one class of persons that it provides to another. But if it can, we do not think the fact that the delinquent child receives administrative review while the neglected child does not, is a sufficiently direct and substantial impairment of those rights to offend the Equal Protection Clause, especially given that judicial review of the removal is imminent. *See Zablocki,* 434 U.S. at 386–87, 98 S.Ct. at 681 ("[W]e do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may be legitimately imposed."). *Cf. Bowen v. Gilliard,* 483 U.S. 587, 601–03, 107 S.Ct. 3008, 3017–18, 97 L.Ed.2d 485 (1987); *Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986); *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). Any infringement on those rights suffered as a consequence of the failure to provide administrative review is vastly different, for example, from the substantial and direct impairment resulting from the

24. Appellants state that the maximum time permitted between the assumption of custody and judicial review under § 16.1–250 is three days. Appellants' Reply Br. at 12. In so stating, appellants apparently have overlooked the last sentence of § 16.1–250(A), which provides that if the seventy-two hours within which the child must be brought before the judge expires on a Saturday, Sunday or other legal holiday, the seventy-two hour period is extended to "the next day which is not a Saturday, Sunday or legal holiday."

indefinite confinement in *Foucha*, —— U.S. at ——, 112 S.Ct. at 1788; the insurmountable impediment to marriage in *Zablocki*, 434 U.S. at 387–88, 98 S.Ct. at 681–82; and the irreversible punishment in *Skinner*, 316 U.S. at 541, 62 S.Ct. at 1219.[25] Accordingly, any classification erected must only rationally further a legitimate state interest in order to satisfy the requirements of the Equal Protection Clause. *See, e.g., Nordlinger v. Hahn,* —— U.S. ——, —— – ——, 112 S.Ct. 2326, 2331–32, 120 L.Ed.2d 1 (1992); *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 457–58, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988).

Perhaps anticipating our rejection of their argument that strict scrutiny is required, the Jordans do contend that the differences allowed by the statutory scheme in the procedures afforded abused children and juvenile delinquents lack rational justification. They argue that both groups of children share the dispositive characteristic that they are in the custody of the state. According them different procedural protections, they argue, is not rationally related to any legitimate state interest.

We disagree. A classification subject to rationality review "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts which could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). *See also, e.g., Nordlinger,* —— U.S. at ——, 112 S.Ct. at 2334; *Bowen,* 483 U.S. at 601–03, 107 S.Ct. at 3017–18; *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 175–79, 101 S.Ct. 453, 459–61, 66 L.Ed.2d 368 (1980). As noted above, the Commonwealth has apparently concluded that the private and public rights implicated by a child's removal from his parents' custody, together with the potential consequences of an erroneous return of a child taken into protective custody to the environment from which he was removed, are such that only judicial review will suffice. It has also apparently determined that review by administrative intake officers, though possibly quicker, is sufficient in the case of the juvenile delinquent, where the child is not likely at risk of harm from his own parents. It is entirely rational for the state to conclude that judicial (as opposed to administrative) and perhaps somewhat more delayed review of the potentially abused child's protective removal is justified where there is with respect to the abused child, but not with respect to the delinquent, a genuine issue as to whether the child would be safe from harm if returned to the custody of his parents.

Given the manifest differences in the purposes of state custody and the different concerns attending the decision to maintain them in shelter care, the differences in procedures afforded abused children and juvenile delinquents are neither irrational nor capricious. Virginia's statutory scheme, and section 63.1–248.9 in particular, therefore, are not violative of the Equal Protection Clause.

### IV.

For the reasons stated, we affirm the district court's dismissal of the Jordans' constitutional challenges to Virginia Code § 63.1–248.9, which permitted the delay between the removal of the Jordans' son and independent review of the state's removal action. We also affirm the district court's dismissal of their claim against the Commonwealth officials relating to their son's removal. We reverse, however, the district court's dismissal of the Jordans' claim against Prince William County and the Prince William County Department of Social Services arising out of that removal itself and remand the case for such further proceedings as are necessary.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

---

**25.** We do not understand Mr. and Mrs. Jordan to advance an independent equal protection claim on their own behalf. To the extent they do, however, we see no merit in such a claim. The deprivation of their liberty as parents, if any, caused by the asserted differential treatment of Christopher from a juvenile delinquent, is even less direct and substantial than that suffered by Christopher.