**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KEENA WHITE, by her Personal
Representative Cindy White; CINDY
WHITE, individually, and Cindy
White as Guardian Ad Litem for
Deidre Jones, Clifford White, Jr.,
Patric White, Daniel White and
Darren White,
Plaintiffs-Appellees,

v.

RUBY CHAMBLISS,
Defendant-Appellant,

No. 95-3025

and

TINA WERTS; TANGA GILCHRIST;
CLARENCE GRAHAM; CASSIE WILSON;
MARIE DUNNAM; RAMONA FOLEY;
BARRY DOWD; WILBERT LEWIS; JAMES
C. SOLOMON, JR.; JOANNE SCHAEKEL;
ANTHONY BONNER; GLADYS BONNER;
TONY BONNER; AIKEN COUNTY
DEPARTMENT OF SOCIAL SERVICES
(ACDSS); DESIREE COUNCIL,
Defendants.

KEENA WHITE, by her Personal
Representative Cindy White; CINDY
WHITE, individually, and Cindy
White as Guardian Ad Litem for
Deidre Jones, Clifford White, Jr.,
Patric White, Daniel White and
Darren White,
Plaintiffs-Appellees,

v.

TINA WERTS; TANGA GILCHRIST;
CLARENCE GRAHAM; MARIE DUNNAM;
RAMONA FOLEY; BARRY DOWD;                    No. 95-3078

WILBERT LEWIS; JAMES C. SOLOMON,
JR.; JOANNE SCHAEKEL; DESIREE
COUNCIL,
Defendants-Appellants,

and

CASSIE WILSON; ANTHONY BONNER;
GLADYS BONNER; TONY BONNER;
AIKEN COUNTY DEPARTMENT OF
SOCIAL SERVICES (ACDSS); RUBY
CHAMBLISS,
Defendants.

2

KEENA WHITE, by her Personal
Representative Cindy White; CINDY
WHITE, individually, and Cindy
White as Guardian Ad Litem for
Deidre Jones, Clifford White, Jr.,
Patric White, Daniel White and
Darren White,
Plaintiffs-Appellees,

v.

CASSIE WILSON,
Defendant-Appellant,

No. 95-3088

and

TINA WERTS; TANGA GILCHRIST;
CLARENCE GRAHAM; MARIE DUNNAM;
RAMONA FOLEY; BARRY DOWD;
WILBERT LEWIS; JAMES C. SOLOMON,
JR.; JOANNE SCHAEKEL; ANTHONY
BONNER; GLADYS BONNER; TONY
BONNER; AIKEN COUNTY DEPARTMENT
OF SOCIAL SERVICES (ACDSS);
DESIREE COUNCIL; RUBY CHAMBLISS,
Defendants.

Appeals from the United States District Court
for the District of South Carolina, at Aiken.
Charles E. Simons, Jr., Senior District Judge.
(CA-93-3058-1-6)

Argued: March 6, 1997

Decided: April 30, 1997

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge,
and BLACK, Senior United States District Judge for the
District of Maryland, sitting by designation.

_____

Reversed by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Luttig and Senior Judge Black joined.

_____

**COUNSEL**

**ARGUED:** Elizabeth Herlong Campbell, NEXSEN, PRUET, JACOBS & POLLARD, L.L.P., Columbia, South Carolina, for Appellants. Sara M. Walker, Columbia, South Carolina, for Appellees. **ON BRIEF:** Susan P. McWilliams, NEXSEN, PRUET, JACOBS & POLLARD, L.L.P., Columbia, South Carolina; Charles E. Carpenter, Jr., RICHARDSON, PLOWDEN, CARPENTER & ROBINSON, P.A., Columbia, South Carolina; Douglas McKay, Jr., Ruskin C. Foster, MCKAY, MCKAY, HENRY & FOSTER, P.A., Columbia, South Carolina; William L. Pope, Roy F. Laney, POPE & ROGERS, Columbia, South Carolina, for Appellants.

_____

**OPINION**

WILKINSON, Chief Judge:

Cindy White brought suit under 42 U.S.C. § 1983 against several officials of the South Carolina Department of Social Services ("the DSS defendants"). White claims the DSS defendants violated her substantive and procedural due process rights by removing her children from her custody and violated her daughter Keena's rights by placing Keena in a home where she died from abuse at the hands of her foster parents. The district court denied the DSS defendants' motion for summary judgment, and those defendants now appeal.

Keena's death was a tragic event. It did not, however, result from the DSS defendants' violation of any "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Accordingly, we find that the DSS defendants were entitled to qualified immunity and reverse the judgment of the district court.

4

I.

Late on the night of November 20, 1991, Cindy White brought her eighteen-month-old son, Daniel, to the emergency room of the University Hospital in Augusta, Georgia with a broken arm. The treating physician, Dr. Shearer, determined that Daniel had sustained a spiral fracture to his arm. A spiral fracture is caused by a powerful twisting force and is a strong indicator of child abuse. Because White was a South Carolina resident, the hospital staff contacted the Aiken County DSS office to report a suspected case of abuse.

When Tanga Gilchrist, the DSS employee on call, arrived at the hospital, she questioned White about Daniel's injury. White claimed she was not in Daniel's bedroom when he broke his arm, but speculated he might have fallen out of his crib and caught his arm in its slats. Dr. Shearer and an orthopedist, Dr. Hankerson, both found White's explanation to be "very unlikely," and Dr. Shearer stated that "the child needed to be in custody."

On November 22, Gilchrist visited the White residence to investigate Daniel's bed and see for herself whether Daniel's injury might have occurred as the result of a fall. She found that the slats of the bed were far enough apart that her arm, which was larger than Daniel's, did not get caught between them. She further noted that Daniel's bed was less than one foot from the floor. This investigation, in combination with the two doctors' opinions, convinced Gilchrist that White's explanation of Daniel's broken arm was implausible. Gilchrist and her supervisor, Ruby Chambliss, determined that an ex parte petition for custody of White's children should be submitted to the Family Court for Aiken County.

On November 26, 1991, DSS filed a petition for emergency protective custody and a petition for removal in Aiken County Family Court. The judge signed an ex parte order granting emergency protective custody on November 26, which DSS received on December 3. On the day the order was received, Gilchrist and another case worker accompanied sheriff's office personnel to White's trailer and took custody of Daniel and the five other White children.

At a hearing the following day, which White attended, the judge determined that there was probable cause for the minor children to be

5

taken into emergency custody. The judge further concluded that in light of the evidence of abuse to Daniel, the children should remain with DSS pending a merits hearing. DSS placed the White children in various foster homes, with eleven-month-old Keena White going to the home of Anthony and Gladys Bonner.

In the weeks between the December 4 emergency protective custody hearing and the scheduled merits hearing, White was allowed supervised visitation with her children. During these visits, White alleges that she noticed scratches and bruises on her children, including Keena. She wrote a letter to Senator Strom Thurmond expressing her concerns. On December 20, Senator Thurmond wrote a letter to DSS on White's behalf. Cassie Wilson, one of the caseworkers on the White case, testified that White had told her that the children routinely sustained minor injuries due to playing or fighting with one another. Furthermore, Tina Werts, another caseworker, testified that she had taken Keena to the doctor with a cold on January 3, and that Keena had appeared to be in good condition on that date. DSS thus concluded that any alleged injuries were the "results of natural child play."

On January 18, 1992, approximately six weeks after she had been placed with the Bonners, Keena died from blows to the head while in the Bonners' care. A forensic pathologist determined that Keena's death was "best classified as homicide," but law enforcement officials were unable to determine who had struck Keena, so no criminal charges were filed. DSS removed all foster children from the Bonners' home and placed no other children with the Bonners after Keena's death. After an investigation, the DSS revoked the Bonners' license due to abuse and neglect.

At the merits hearing on January 24, 1992, DSS and White submitted a settlement agreement in which White agreed to acknowledge that Daniel White had been abused by an "unknown" perpetrator. DSS returned legal and physical custody of the children to White on the condition that she receive a psychological evaluation, including observation of the family unit, at the expense of DSS.

On November 18, 1993, White brought this lawsuit as personal representative of the estate of Keena for Keena's wrongful death, pain

6

and suffering, and violations of Keena's due process rights. She also sued as guardian ad litem for her five children and on her own behalf claiming DSS violated both her and her children's due process rights. Ruby Chambliss, Tanga Gilchrist, Cassie Wilson, Tina Werts, and various other DSS officials were named as defendants in the suit along with the Bonners.

After extensive discovery, the DSS defendants filed motions for summary judgment based on qualified immunity which were denied by the district court. The DSS defendants then filed the instant appeal.

II.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). White alleges constitutional violations in three phases of DSS's actions. First, she maintains that the DSS defendants violated her family's constitutional rights in the initial decision to remove her children. Second, she contends that Keena's due process rights were violated when she was placed with the Bonners. Lastly, she contends that the DSS defendants did not adequately protect Keena's safety after she was placed in the Bonners' care. We shall review these contentions in turn.[1]

A.

White first asserts that DSS unlawfully seized her children and that the illegal seizure violated her right to custody. This is no idle claim.

_____

[1] The appeal of the district court's denial of qualified immunity is properly before this court on interlocutory review. Mitchell v. Forsyth, 472 U.S. 511 (1985). In this case, the district court failed to make any findings or undertake any analysis in support of its denial of qualified immunity. As a result, we must engage in an independent examination of the record, viewed in the light most favorable to the nonmoving party. Johnson v. Jones, 115 S.Ct. 2151, 2159 (1995); Winfield v. Bass, 106 F.2d 525, 533 (4th Cir. 1997) (en banc).

7

As we have recognized, "[t]here are few rights more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate." Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 342 (4th Cir. 1994). These rights, however, are not absolute. The parent's right to custody is subject to the child's interest in his personal health and safety and the state's interest as parens patriae in protecting that interest. Id. at 346; see also Renn v. Garrison, 100 F.3d 344, 349 (4th Cir. 1996).

The DSS defendants removed the White children under the authority of law which this court has adjudged constitutional. South Carolina law limits the state's authority to assume emergency protective custody over children to those circumstances where "there is probable cause to believe that by reason of abuse or neglect there exists an imminent danger to the child's life or physical safety." S.C. Code § 20-7-610(F)(2); see also S.C. Code § 20-7-610 (A)(1). Recently we upheld the constitutionality of a Virginia statute which similarly constrained the state's power to take emergency custody of children, noting that "[w]hile there is always a risk of error when an emergency removal of a child from his parents' custody is required, the Commonwealth has substantially reduced that risk at the threshold by the imposition of significant substantive limitations upon the removal authorization." Jordan, 15 F.3d at 346.

Moreover, substantial evidence supported the DSS defendants' decision to pursue an order for the removal of the White children. Gilchrist sought the opinions of two medical professionals who told her that the spiral fracture Daniel had suffered was strong evidence of child abuse. Gilchrist also consulted with White and listened to her explanation of Daniel's injury. Gilchrist was entitled to rely on the professional judgments of the two physicians that White's explanation of Daniel's injury was "highly unlikely." See Youngberg v. Romeo, 457 U.S. 307, 324-25 (1982); Hogan v. Carter, 85 F.3d 1113, 1117 (4th Cir. 1996) (en banc). Moreover, Gilchrist's examination of Daniel's crib further demonstrated that White's explanation of Daniel's injury was implausible. Gilchrist thus came to the reasonable conclusion that there was a significant probability of child abuse within the White household. And, as we held in Weller v. Dep't of Social Servs. for Baltimore, 901 F.2d 387, 391 (4th Cir. 1990), removal of a child

8

in an emergency action is constitutional when there is "some evidence of child abuse."

White also contends that she and her children were denied procedural due process. We disagree. The Fourteenth Amendment interest that White possesses runs to court proceedings provided under state law and not to the discretionary discharge by DSS of its duties. Weller, 901 F.2d at 392. As to those court procedures, we have noted that "the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child." Jordan, 15 F.3d at 343; Weller, 901 F.2d at 393. In this case, DSS sought a judicially approved ex parte order before removing the White children. Furthermore, a full hearing was held within twenty-four hours of the removal. DSS therefore fully complied with this circuit's directive that such a hearing should be held soon after an emergency removal. Jordan, 15 F.3d at 351. In Jordan, we approved a hearing which was held some 65 hours after a child was removed from his home. Perforce, the much prompter hearing held in this case cannot be judged constitutionally invalid. Under these circumstances, we cannot conclude that White was denied the process she was due. **2**

The discretionary judgment which was made in removing the White children was obviously not an easy one. It involved weighing professional opinions of child abuse against the obvious interests in maintaining the integrity of a household. Here the tug and pull of competing concerns is evident. Premature action by a social worker can disrupt the legitimate interest parents possess in raising and disciplining their children. On the other hand, a failure to act can leave a child defenseless in the face of physical abuse and brutality. These types of decisions are precisely the sort that the doctrine of qualified immunity is designed to protect. See Wood v. Strickland, 420 U.S.

_____

**2** White also alleges that she and her children were denied their constitutional right of access to the courts. White does nothing more, however, than posit the existence of an abstract right, and that is not sufficient to defeat qualified immunity. See Anderson v. Creighton, 483 U.S. 635, 640-41 (1987); Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). White has failed to point to any facts which would demonstrate that her or her children's right of access to the courts was violated by the DSS defendants in this case.

308, 319-20 (1975). If section 1983 liability attaches too readily to removal and placement decisions, the course of public agencies would invariably become one of inaction, thus leaving children in abusive environments. The facts presented by White reveal that the DSS defendants violated no "clearly established" law in removing White's children from her custody. Therefore, qualified immunity must lie. Harlow, 457 U.S. at 818.

B.

White next claims that the DSS defendants violated Keena's constitutional rights when they placed her in the Bonner home. A negligent placement, of course, would implicate no federal rights for questions of negligence have long been regarded by the Supreme Court as within the province of state law. Daniels v. Williams, 474 U.S. 327, 328 (1986). White, however, refers us to circuit cases where DSS defendants were alleged to have crossed the line from negligence into deliberate indifference thus implicating substantive Fourteenth Amendment protections. See K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 852 (7th Cir. 1990) ("The only right in question in this case is the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, whom the state knows or suspects to be a child abuser."); accord Meador v. Cabinet for Human Resources, 902 F.2d 474, 476 (6th Cir. 1990); Taylor v. Ledbetter, 818 F.2d 791, 797 (11th Cir. 1987); Doe v. New York City Dept. of Social Servs., 649 F.2d 134, 141 (2d Cir. 1981).

Whatever the clearly established law on this question, White's claim simply falls short on the facts. The summary judgment record contains no evidence to indicate that any of the DSS defendants knew or suspected that the Bonners were abusive foster parents when they placed Keena in their care. Indeed, the Bonners were licensed by the DSS, and White points to no evidence indicating that the Bonners had previously been accused of, or investigated for, child abuse. A claim of deliberate indifference, unlike one of negligence, implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice. There is simply no evidence that the DSS defendants were on notice of any problem at the time the placement decision was made.

10

C.

White also asserts that the DSS defendants had a clearly estab-
lished duty to protect Keena from abuse after she was placed with the
Bonners. In order for a right to be "clearly established," the Supreme
Court has instructed that "[t]he contours of the right must be suffi-
ciently clear that a reasonable official would understand that what he
is doing violates that right." Anderson v. Creighton, 483 U.S. 635,
640 (1987).

In DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S.
189 (1989), the Supreme Court held that the state had no affirmative
duty to protect a child from abuse when that child was not in state
custody. However, the Court specifically declined to determine
whether placing a child in foster care would constitute the sort of cus-
todial relationship that would give rise to a duty of protection. Id. at
201 n.9. By 1991, when the events relevant to the instant suit
occurred, this circuit had squarely held that children placed in foster
care had no federal constitutional right to state protection. In Milburn
v. Anne Arundel County Dep't of Social Servs., 871 F.2d 474 (4th Cir.
1989), the court considered a claim brought by parents who had
placed their child in the state foster care system. While in foster care,
the child was subjected to abuse and required medical treatment on
four separate occasions. The child's parents brought suit against the
state DSS and several officers of the DSS alleging that they had
breached the child's right to protection. The court noted that the state
had no affirmative constitutional obligation to protect individuals
against private violence, id. at 476, and went on to reject the parents'
claim, reasoning that foster parents were private actors and not agents
of the state:

> The State of Maryland was not responsible for the specific
> conduct of which plaintiff complains, that is, the physical
> child abuse itself. It exercised no coercive power over the
> Tuckers; neither did it encourage them. The care of foster
> children is not traditionally the exclusive prerogative of the
> State. Thus . . . the Tuckers should not be considered state
> actors.

Id. at 479 (citations omitted).

11

Nothing in Milburn limited its application to situations where parents had voluntarily placed their children in foster care, and Milburn was not interpreted as being so limited in subsequent Fourth Circuit cases. In Weller, for example, the court relied on Milburn for the proposition "that harm suffered by a child at the hands of his foster parents is not harm inflicted by state agents." 901 F.2d at 392. Given the state of this circuit's law on the issue and the absence of controlling Supreme Court authority, we cannot say that a right to affirmative state protection for children placed in foster care was clearly established at the time of Keena's death.

White next argues that the South Carolina Child Protection Act forms the basis of a clearly established right to protection while in foster care which is enforceable under 42 U.S.C.§ 1983. We disagree. The Supreme Court has made clear that section 1983 provides a cause of action for "violations of federal statutory as well as constitutional law." Maine v. Thiboutot, 448 U.S. 1, 4 (1980). Following Thiboutot, this circuit explicitly rejected the contention that state child welfare statutes create substantive due process rights enforceable through section 1983. For example, in Weller, we held:"If Weller is seeking compliance with state law, this is not the proper forum. Even if BCDSS did violate state laws, it is well settled that violations of state law cannot provide the basis for a due process claim." 901 F.2d at 392 (citation omitted); see also Hodge v. Jones, 31 F.3d 157, 168 (4th Cir. 1994). Indeed, this circuit has specifically rejected the contention that the very statute at issue in this case -- the South Carolina Child Protection Act -- creates substantive rights enforceable through a section 1983 action. See Jensen v. Conrad, 747 F.2d 185, 195 n.12 (4th Cir. 1984).**3**

_____

**3** Our decision in Better Government Bureau, Inc. v. McGraw, 106 F.3d 582 (4th Cir. 1997), is not to the contrary. That case referred to state law to determine only whether an official performed an act "clearly established to be beyond the scope of his discretionary authority." Id. at 592. Better Government Bureau, therefore, is inapplicable here as the defendants in this case are being sued for discretionary judgment calls that clearly fell within the scope of their duties as social workers. Moreover, Better Government Bureau had not been decided when the actions relevant to this suit occurred.

12

Because the South Carolina Child Protection Act does not create a clearly established substantive federal right, the immunity claims of the DSS defendants do not rise or fall on questions of state law. As we noted in Jordan, the whole area of domestic relations has "`been left to the States from time immemorial, and not without good reason.'" 15 F.3d at 348 (quoting Santosky v. Kramer, 455 U.S. 745, 770 (1982) (Rehnquist, J., dissenting)). Domestic violence of all varieties is one of the most wrenching problems that any society must face, but to federalize the issue through the vehicle of section 1983 is not the answer. That is not to say that there should be no remedy, but rather that where state officials acting within the scope of their discretionary duties commit violations of state law, one must look to state law and to state courts to pursue those remedies that the state has provided. In South Carolina, for example, aggrieved individuals may pursue a state law cause of action under the South Carolina Child Protection Act for public officials' alleged failures to abide by the directives of that statute. See Jensen v. Anderson County Dep't of Social Servs., 403 S.E.2d 615, 617 (S.C. 1991).

Lastly, White argues that since South Carolina receives federal funds for its child welfare program, plaintiffs had an enforceable right to protection through the provisions of the federal Adoption Assistance and Child Welfare Act ("AACWA"). Specifically, White points to 42 U.S.C. § 671(a)(10), which states:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which --
>
> (10) provides for the establishment or designation of a State authority or authorities which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and provides that the standards so established shall be applied by the State to any foster

13

> family home or child care institution receiving
> funds under this part or part B of this subchapter.

The Supreme Court addressed the availability of privately enforce-able rights under the AACWA in <u>Suter v. Artist M.</u>, 503 U.S. 347 (1992). Section 671(a)(15) of that statute requires a state to make "reasonable efforts" to return children placed in foster care to their homes. The Court held that this section created no private right of action under section 1983 because (1) the section did not state a clear requirement of any conditions on state receipt of federal grants, <u>id</u>. at 356-57; (2) the statute did not include any "statutory guidance . . . as to how `reasonable efforts' are to be measured," <u>id</u>. at 360; and (3) section 42 U.S.C. § 671(b) provided for the establishment of an alter-native enforcement mechanism, <u>id</u>. at 360-61.

For the same reasons, section 671(a)(10) does not create an enforceable right. The requirement that a state's plan be "reasonably in accord with recommended standards of national organizations," is no more specific than section 671(a)(15)'s "reasonable efforts" requirement. Furthermore, the AACWA provides no"statutory guid-ance" to clarify the meaning of the requirements of 671(a)(10). Lastly, section 671(a)(10) is enforceable through the same alternative enforcement mechanism provided for section 671(a)(15). As the Supreme Court noted in <u>Suter</u>, "[t]he Secretary [of Health and Human Services] has the authority to reduce or eliminate payments to a State on finding that the State's plan no longer complies with § 671(a) or that `there is a substantial failure' in the administration of a plan such that the State is not complying with its own plan." 503 U.S. at 360. <u>Suter</u> thus forecloses the argument that section 671(a)(10) of the AACWA provides the source for an enforceable right through section 1983. <u>See also Wildauer v. Frederick County</u>, 993 F.2d 369, 373 (4th Cir. 1993).**4**

_____

**4** The congressional response to <u>Suter</u> codified at 42 U.S.C. § 1320a-2 does not alter our view. As an initial matter, that response came after the events relevant to this case. Further, Congress made clear that the statute was "not intended to alter the holding in <u>Suter v. Artist M.</u> that section 671(a)(15) . . . is not enforceable in a private right of action." 42 U.S.C. § 1320a-2. Lastly, <u>Suter</u> itself was not a novel holding, but rather rested upon settled legal principles with regard to private rights of action in the context of the AACWA.

We are again mindful that this case has involved the loss of a child's life. We are unable, however, from the record before us to attribute this sad occurrence to constitutional or federal statutory defalcations of the defendants in this case. The only evidence in the record indicating potential abuse by the Bonners is White's complaint regarding bruises and scratches on Keena and her other children. White, however, had told Cassie Wilson, a DSS caseworker, that her children often sustained such injuries in the course of playing or fighting. Furthermore, Tina Werts, another caseworker, took Keena to the doctor for a cold on January 3 and observed that she appeared to be in good condition. Given these circumstances, DSS reasonably concluded that any scratches and bruises on Keena arose from normal child play.

We are reminded again that the defense of qualified immunity is often asserted in the most difficult of cases. Yet it is precisely for the hard case that the immunity exists. The availability of immunity cannot be judged solely by tragedies that later occur or by mistakes that later come to light. Knowing what we know now, no child would have been placed in the care of the Bonners. But now is not then, and few mortals stand unscathed by hindsight. The question under qualified immunity is thus whether fallible and imprescient human beings acted reasonably on the law as it stood and on the facts as they were known at the time the action was taken. Anderson , 483 U.S. at 641. On this record, we are unable to find that the standard of objective reasonableness applied to the actions of public officials has been transgressed.

III.

For the foregoing reasons, we conclude that the DSS defendants are entitled to qualified immunity. Because the district court erred in denying their motion for summary judgment, we hereby reverse.

REVERSED

15